## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> RUDY AVILA a/k/a JOSE RODOLFO AVILA GUTIERREZ, THE L.I.F.T. GROUP LLC, CIG INTERNACIONAL SOCIEDAD ANONIMA (a/k/a COMMODITY INVESTMENT GROUP, a/k/a CIG INTERNACIONAL, a/k/a CIG INTERNATIONAL, a/k/a C.I.G. INTERNACIONAL, SA, a/k/a C.I.G. INTERNATIONAL, SA, and a/k/a CIG), TRADING TECHNOLOGIES GROUP SOCIEDAD ANONIMA (a/k/a TRADING TECHNOLOGIES GROUP SA, a/k/a TRADING TECHNOLOGIES GROUP), TRADING VENTURES GROUP, LLC, CAPITAL VENTURES GROUP, LLC, and VENTURES GROUP, LLC, <br><br> Defendants. | **CIVIL ACTION NO:** <br><br> **Complaint for Injunctive and Other Equitable Relief and Civil Monetary Penalties Under the Commodity Exchange Act.** <br><br> **JURY TRIAL DEMANDED** |

The Commodity Futures Trading Commission ("Commission"), by and through its attorneys, hereby alleges as follows:

## I.    SUMMARY

1.    Since at least 2017 and continuing through at least spring of 2020 (the "First Relevant Period"), defendants Rudy Avila a/k/a Jose Rodolfo Aguila Gutierrez ("Avila"), his company The L.I.F.T. Group, LLC ("LIFT"), and two Costa Rican companies: (1) CIG

International Sociedad Anónima (a/k/a Commodity Investment Group, a/k/a CIG Internacional, a/k/a CIG International a/k/a, C.I.G. Internacional, SA, a/k/a C.I.G. International, SA, and a/k/a/ CIG) (collectively, "CIG"); and (2) Trading Technologies Group Sociedad Anónima (a/k/a Trading Technologies Group SA, a/k/a Trading Technologies Group) (collectively, "TTG") (CIG and TTG together, "Costa Rican Companies" and with Avila and LIFT, "CIG Defendants"), acting through Avila and their officers, employees or agents, engaged in a scheme and artifice to defraud whereby they fraudulently solicited and obtained at least $4.2 million from at least 170 clients ("CIG clients") for the purported purpose of trading commodity futures, options on commodity futures, and retail off-exchange foreign currency ("CIG Scheme").

2.      Also, since at least 2019, and continuing to the present (the "Second Relevant Period"), defendants Avila and three companies: (1) Trading Ventures Group, LLC ("TVG"), (2) Capital Ventures Group, LLC ("CVG"), and (3) Ventures Group, LLC ("VGL") (together, "Ventures Companies" and together with Avila, "Trading Ventures Defendants"), acting through Avila and their officers, employees, or agents, engaged in another scheme and artifice to defraud whereby they fraudulently solicited and obtained at least $1.8 million from at least 55 clients ("TVG clients") for the purported purpose of trading commodity futures, options on commodity futures, and retail off-exchange foreign currency ("Trading Ventures Scheme").

3.      Instead of trading funds as promised, both CIG Defendants and Trading Ventures Defendants (collectively, "Defendants") willfully, or with reckless disregard for the truth thereof, obtained and misappropriated CIG and TVG client funds, respectively, by making false material representations, pretenses, and promises and made material misrepresentations to their clients which included that: (1) CIG and TVG traders would use their discretion to trade clients' funds in commodity futures, options on commodity futures, and retail off-exchange foreign currency

2

(together "Derivatives and Forex").  Accordingly, both CIG and TVG, without registering with the Commission and for compensation or profit, engaged in the business of advising, managing, and trading Derivatives and Forex on behalf of their clients; and (2) they were promised profits. CIG Defendants, directly and/or through their officers, employees or agents, also falsely represented to CIG clients that CIG was a U.S. based company and that CIG client funds were controlled by U.S. based businesses and maintained in the U.S. in U.S. bank accounts.  Similarly, Trading Ventures Defendants,  directly and/or through their officers, employees or agents, falsely represented to TVG clients that TVG client investments were going to be maintained in U.S. bank accounts in the U.S.  In fact, most of the CIG and TVG clients' funds were transferred to Costa Rica.  Defendants also provided clients with access to fake trading statements that reflected fictitious trading gains and losses.

4.     Defendants also willfully, or with reckless disregard for the truth thereof, concealed material information and failed to disclose to clients that: (1) their funds were not used, as promised, to trade Derivatives and Forex; (2) there were no profits from trading and/or that they could not promise profits; and (3) their funds were misappropriated and sent to companies and individuals at their bank accounts in Costa Rica.  Instead, in the manner of a Ponzi scheme, Defendants used certain client funds to make payments to other CIG and TVG clients.

5.     In addition, Avila failed to disclose to CIG and TVG clients that he participated in a prior foreign currency ("Forex") and commodity futures trading scheme involving a company called Starwood Asset Management Fund ("Prior Forex Scheme") and during the course of this Prior Forex Scheme, Avila defrauded Starwood Asset Management Fund ("Starwood") clients. (See paragraphs 66-72 of the Complaint: Avila pled guilty to wire fraud for defrauding Starwood

clients).  Last, CIG Defendants failed to disclose to CIG clients that CIG was a Costa Rican

company operating in Costa Rica.  To conceal his participation and the participation of others in

the Trading Ventures Scheme, Avila directed that text communications relating to the Trading

Ventures Scheme be destroyed.

6.     In sum, Defendants never traded on behalf of their clients and, instead, stole most

of their clients' investments.  CIG clients lost a total of $3.58 million in the CIG Scheme and

Trading Ventures clients lost a total of at least $1.77 million in the Trading Ventures Scheme.

7.     Avila controlled LIFT and VGL and knowingly induced, directly or indirectly,

their violations or did not act in good faith.

8.     By this conduct, and the conduct further described herein, CIG Defendants and

Trading Ventures Defendants violated Sections 4b(a)(1)(A), (B), (C) and 4b(a)(2)(A), (B), (C) of

the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6b(a)(1)(A), (B), (C) and 6b(a)(2)(A), (B),

(C) (2018) and Commission Regulation ("Regulation") 5.2(b), 17 C.F.R. § 5.2(b) (2020)

("Futures and Forex Fraud Violations"); and 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018) and

Regulation 33.10, 17 C.F.R. § 33.10 (2020) ("Options Fraud Violations").

9.     Moreover, by this conduct, and the conduct further described herein, Defendant

CIG and Defendant TVG violated Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2018) and

Regulation 5.3(a)(3), 17 C.F.R. § 5.3(a)(3) (2020) ("CTA Registration Violations"), and Section

4o(1)(A), (B) of the Act, 7 U.S.C. § 6o(1)(A) and (B) (2018) ("CTA Fraud Violations").

10.     LIFT, the Costa Rican Companies, and the Ventures Companies are liable for the

actions of their officers, employees, or agents, including Avila, and thus are also liable for their

Futures and Forex Fraud Violations and Options Fraud Violations pursuant to Section 2(a)(1)(B)

of the Act, 7 U.S.C. § 2(a)(1)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2 (2020).  Likewise,

CIG and TVG also are liable for the actions of their officers, employees, or agents, including Avila, for their CTA Fraud Violations pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

11.    Avila, as the controlling person of LIFT and VGL, is liable for the Futures and Forex Fraud Violations and the Options Fraud Violations of LIFT and VGL pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2018).

12.    The Commission brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), to enjoin the CIG and Trading Ventures Defendants' unlawful acts and practices and to compel their compliance with the Act and the Regulations promulgated thereunder.  In addition, the Commission seeks civil monetary penalties, and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other and further relief as the Court may deem necessary or appropriate.

13.    Unless restrained and enjoined by this Court, Defendants will likely continue to engage in acts and practices alleged in this Complaint and similar acts and practices, as described below.

## II.    JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c(a) of the Act, 7 U.S.C. § 13a-l(a) (2018) authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice that violates any provision of the Act or any rule, regulation, or order promulgated thereunder.

15.     Venue properly lies with this Court under Section 6c(e) of the Act because Defendants transacted business in this District, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District.

### III.     PARTIES

16.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the responsibility for enforcing the provisions of the Act, 7 U.S.C. §§ 1-28 (2018), and the Regulations promulgated thereunder, 17 C.F.R. Pt. 1-190 (2020).

17.     Defendant **Rudy Avila** (a/k/a Jose Rodolfo Avila Gutierrez) is a resident of Dallas, Texas and is the sole member, managing member, and CEO of The L.I.F.T. Group LLC and a signatory for its bank accounts ("LIFT Bank Accounts").  Avila also is the sole owner of Ventures Group LLC and the sole signatory for its bank account ("VGL Bank Account").  Avila has never been registered with the Commission.

18.     Defendant **The L.I.F.T. Group LLC** is a Texas Limited Liability Company formed on March 11, 2015 and currently in good standing.  According to a corporate filing and one of the LIFT Bank Accounts, LIFT had a place of business in Dallas, Texas at an address that is also Avila's residence.  According to an amended corporate filing and LIFT's lease agreement for its place of business, LIFT had another place of business at a virtual office address in Dallas, Texas.  LIFT has never been registered with the Commission.

19.      Defendant **CIG Internacional Sociedad Anónima** (a/k/a Commodity Investment Group, a/k/a CIG Internacional, a/k/a CIG International, a/k/a C.I.G. Internacional, a/k/a C.I.G. International, SA, and a/k/a/ CIG) is a company organized under the laws of Costa Rica on April 24, 2018.  According to its website, www.cig.international.com ("CIG Website"),

CIG was a "global investment firm with full brokerage and trading services." Also, on its CIG Website, CIG listed three places of business: a place of business in Dallas, Texas at the same address where LIFT had a virtual office; a place of business in New York City; and a place of business at the physical address of the bank where two of the LIFT Bank Accounts were held. CIG has never been registered with the Commission.

20.      Defendant **Trading Technologies Group Sociedad Anónima** (a/k/a Trading Technologies Group SA and a/k/a Trading Technologies Group) is a company organized under the laws of Costa Rica formed on November 12, 2015. Avila is, or has been, the Vice President and Auditor of TTG. TTG has never been registered with the Commission.

21.      Defendant **Trading Ventures Group LLC** is a Texas Limited Liability Company formed on May 26, 2020 and currently in good standing. According to its website, www.tradingventuresgroup.com ("TVG Website"), TVG had a place of business in Irving, Texas, which is a virtual office address, and also in London, UK. TVG has never been registered with the Commission.

22.      Defendant **Capital Ventures Group, LLC** is a Texas Limited Liability Company formed on September 19, 2019 and currently in good standing. According to corporate filings and CVG's lease agreement for its business location, CVG had a place of business at a virtual office address in Addison, Texas. CVG has never been registered with the Commission.

23.      Defendant **Ventures Group, LLC** is a Texas Limited Liability Company formed on May 28, 2019 and currently in good standing. According to a corporate filing and its bank account, VGL had a place of business in Dallas, Texas at the same address and office number where LIFT had a virtual office. Also, according to other public records and VGL's lease agreement for its business location, VGL had a place of business in Irving, Texas at the same

address where Trading Ventures Group had a virtual office.  VGL has never been registered with the Commission.

### IV.   FACTS

**A.  CIG Scheme**

24.     During the First Relevant Period, Avila, LIFT, and the Costa Rican Companies directly and/or through their officers, employees or agents, engaged in a scheme and artifice to defraud CIG clients by fraudulently soliciting clients to trade Derivatives and Forex through CIG; failing to disclose and/or concealing material information from clients; misappropriating client funds; and making and/or assisting in making fake trading statements available to clients. In support of their scheme, the CIG Defendants used the CIG Website and a related email address: support@cig.international ("CIG Email"), the LIFT websites, www.theliftgroupinternational.com and http://theliftgroupllc.com, and related email domain: rudy@theliftgroupllc.com, the LIFT Bank Accounts, and promotional materials, to trick CIG clients to invest and to further perpetuate this scheme.

a. *CIG Website*

25.     CIG's Website represented to potential or existing clients that CIG was a "global investment firm with full brokerage and trading services" that invested in "over 72 different commodities worldwide" with "our group of successful traders."

26.     Despite the claims made on the CIG Website, CIG was not a global investment firm providing brokerage and trading in commodities through a group of successful traders. Instead, CIG was a Costa Rican company operating out of Costa Rica that used salesmen, acting on behalf of the CIG Defendants, to make unsolicited calls to potential and actual CIG clients.

These salesmen falsely claimed to be CIG Traders who would open, manage, and trade individual accounts for CIG customers.

27.     The CIG Website and its Email also claimed that CIG had its main offices in Dallas, Texas, its "trading offices" at 40 Wall Street, Suite 508, New York, NY 10005 ("40 Wall Street"), and a physical address at the bank where two of the LIFT Bank Accounts were held.

28.     These statements are false material representations.  CIG had no office or traders in Texas or at the physical address where the LIFT Bank Accounts were held.  The address for CIG's purported office in Dallas was a virtual office leased out to LIFT and paid by Avila through the LIFT Bank Accounts.  CIG did not have an address at the bank where the LIFT Bank Accounts were held or at 40 Wall Street.

29.     CIG's Website misrepresented that its "clearing company" is "regulated by the financial authorities and [the] most respected banks in the world," including six U.S. and one UK bank and that, together with and through its "clearing company," CIG "maintains a strict control of the financial health and business procedures" that CIG "encounters."  This is a false representation.  The UK clearing company CIG refers to in its website and identifies by name in its emails to CIG clients has never had any relationship with CIG.  Similarly, the "banks" identified by CIG in its Website have never held accounts or had any relationship with CIG.

30.     In short, CIG's Website was a sham created for the purpose of supporting CIG's fraudulent solicitations, facilitating misappropriation of client funds, and making available false trading statements to CIG clients.

     b.  *CIG Defendants' Fraudulent Conduct*

31.     Avila and salesmen by phone, word of mouth, mail, and CIG's Email as well as through CIG's Website, solicited CIG clients.  Many CIG clients received unsolicited phone

calls from salesmen, acting on behalf of the CIG Defendants falsely purporting to be CIG

Traders who, with the knowledge of the CIG Defendants, falsely represented to potential and

actual clients that they would open, manage, exercise discretionary authority, and trade clients'

individual CIG accounts in Derivatives and Forex through CIG.

32.     Avila used the LIFT Bank Accounts to pay for a list of names provided by a

telemarketing firm from which potential CIG victims were identified and solicited.

33.     To entice CIG clients to invest, the salesmen falsely represented to clients that

CIG was a broker out of Dallas with decades of experience trading Derivatives and Forex and

offices in Wall Street.  They also falsely promised some CIG clients that they would double their

investment in a month.  The salesmen and Avila also falsely told and promised CIG clients that

their investments were safe because their investments were maintained in the LIFT Bank

Accounts in the U.S. and controlled by LIFT, a U.S. company located in the U.S., and that their

trades would be made on U.S. or London exchanges.

34.     Typically, after a CIG client agreed to open an individual managed account

through CIG, CIG then required the client to fill out a CIG questionnaire form and discretionary

and/or non-discretionary forms ("CIG Forms").

35.     Avila, directly, and at times on behalf of LIFT, facilitated onboarding of new CIG

clients by sending the CIG Forms to CIG clients.  Clients in turn sent their signed and completed

Forms back to Avila and/or LIFT and Avila sent these completed CIG Forms to CIG and an

associate of TTG.

36.     Avila also, at times, marketed CIG by sending CIG promotional materials to CIG

Clients, which included a welcome letter, a power point presentation, and purported market

analyses ("CIG Promotional Materials").  The power point presentation falsely represented to

CIG clients that CIG was an established trading outfit that cleared trades with a legitimate UK-based clearing house, had partnerships with top banks in the world where CIG kept segregated trading accounts for CIG clients, and had a broker registration number with the UK's financial regulatory authority.

37.     The representations made by the salesmen and the CIG Promotional Materials that Avila facilitated and marketed to CIG clients were simply false.  There was no trading.  CIG had no relationship with the UK clearing house or the banks, was not registered with the UK financial authorities, held no segregated bank accounts for CIG clients, and did not generate any purported returns on behalf of its CIG clients.  CIG was a Costa Rican company operating out of Costa Rica targeting unsuspecting U.S. investors to wire or deposit their investments to LIFT Bank Accounts in the U.S. where they were purportedly held safely by LIFT, a U.S. company. Instead, Avila, who owned, controlled, and operated LIFT and controlled the LIFT Bank Accounts simply wired most of the CIG client investments to bank accounts in Costa Rica where they were stolen by the CIG Defendants.

38.     Once CIG received signed copies of the CIG Forms, CIG sent clients an email with trading account funding instructions.  These instructions were created by Avila and included instructions for clients to send their investments by wire or check to the LIFT Bank Accounts controlled and managed by Avila.  These funding instructions also told CIG clients to make checks payable to LIFT, not CIG, and to send these checks to one of the LIFT Bank Accounts.

39.     Avila further facilitated and participated in the operation of the CIG Scheme by preparing and maintaining an excel spreadsheet with detailed accounting of all CIG clients' deposits into the LIFT Bank Accounts, including the CIG client's name, the amount received from the CIG client, the date the funds were received, the amount wired to bank accounts in the

11

names of CIG and TTG ("Costa Rican Bank Accounts"), or other accounts in Costa Rica and the

U.S., a running balance for each CIG client, commission fees, and funds sent back to CIG clients

from the Costa Rican Bank Accounts ("Spreadsheet").  Avila routinely sent a copy of his

Spreadsheet to CIG and others and notified CIG that investments were deposited into the LIFT

Bank Accounts.  CIG clients would then receive an email communication from the CIG Email

that their "trading accounts" were funded, together with an ID password and an Account Number

to access their trading statements through the CIG Website platform.  These trading statements

were fake as they contained fake or fictitious trades and fake or fictitious profits and losses.

40.     At various times, CIG clients attempted to withdraw funds from their trading

accounts.  CIG sent some clients a small amount of funds but did not return funds to most of the

clients that requested withdrawals.

41.     In late winter/early spring of 2020, CIG sent clients an email (or were told by

phone) that due to Covid, CIG "North American Offices will close," and that "clients wishing to

receive a Withdrawal Form or receive funds home have to be patient in these trying times; as

soon as we are able to process them, we will send them out."  Avila directly, or through LIFT,

sent withdrawal forms to some CIG clients.  CIG clients filled out and signed the form, and

returned it to LIFT's virtual office address in Dallas, Texas.  Some clients received a fraction of

their investment back but most lost all of their investment. CIG and TTG misappropriated client

funds that LIFT sent to their bank accounts in Costa Rica, and others in Costa Rica or in the

U.S., and/or were used by Avila for his own purposes.  For example, Avila sent at least $440,000

of client funds from the LIFT Bank Accounts to CIG bank accounts in Costa Rica and at least

$450,000 of client funds to the TTG bank accounts in Costa Rica.

c. *LIFT's Relationships with Avila, CIG, and TTG*

42.     Avila was involved in the creation of the LIFT Website, which defined LIFT as

"Loans, Investments and Financial Transactions," and featured a photograph of Avila, who was

described as an "International Finance Consultant."  The LIFT website advertised that Avila had

"many investment opportunities available," including "domestic and International Investments

with reputable individuals and groups designed to help your group."  A later version of the

website claimed to provide clients with "Licensed Investments & Financial Services," including

"trading and financing."  The website represented that LIFT had "decades of experience in the

financial markets" and offered "liquidity providers."

43.     Contrary to statements on its website, LIFT is a single member Texas company,

formed by Avila in 2015.  Avila was not a licensed financial consultant and neither he nor LIFT

ever held a license in the financial, banking, loan, or trading sectors.  Avila formed, owned,

operated, and used LIFT to facilitate the solicitation of CIG clients and then used the LIFT Bank

Accounts he controlled as a mechanism to capture client deposits.  He further used LIFT to

falsely represent to CIG clients that their investments were controlled by a U.S. business and

maintained in U.S. based bank accounts.  Moreover, Avila also used the LIFT Bank Accounts to

misappropriate and send client funds to both CIG and TTG bank accounts in Costa Rica.  In

addition, TTG assisted in concealing the misappropriation of these client funds into its bank

accounts by acting with Avila, LIFT, and others to falsely represent that these client funds were

lawful proceeds of its business relationship with LIFT.  For example, on July 31, 2018, when

TTG's bank in Costa Rica questioned the source of funds transferred from LIFT into the TTG

account, Avila provided a letter to the bank, on LIFT stationary, falsely claiming that LIFT "has

been working closely with Trading Technologies Group, SA for almost a year," that LIFT "only

13

partner(s) with reputable companies here and abroad," and that TTG "is a company that meets or exceeds our expectations." The letter further stated that LIFT has a "wonderful business relationship" with TTG, is "looking forward to seeing our partnership grow," and that LIFT is a "consulting firm" and it feels "very strongly in having our clients invest with Trading Technologies Group, SA.…"

44.    From 2017 to 2020, Avila used these LIFT Bank Accounts to take in CIG client funds totaling at least $4.2 million from at least 170 CIG clients. Avila then wired CIG client funds mostly to bank accounts in Costa Rica. For example, on November 13, 2019, a CIG salesman falsely represented to a CIG client that he would trade gold and heating oil for the client and that he was guaranteed to make money. Based on these false representations, the client transferred $13,000 to a LIFT bank account for the purpose of investing in the CIG Scheme and in return this client's funds were stolen. Avila also misappropriated clients' funds for his own purposes in the amount of at least $440,000, including paying high interest personal loans and apartment related expenses in Costa Rica, purchasing automobiles, spending funds at restaurants and using funds for travel and purchasing consumer goods, writing checks made payable to himself, and making cash and ATM withdrawals, among other things. Then, in the mode of a Ponzi scheme, Avila paid at least $620,000 from certain client funds in the LIFT Bank Accounts to other CIG clients to perpetuate this Ponzi scheme.

d. *Example of Avila's Fraudulent Solicitations to CIG Client*

45.    In August and September 2019, Avila made numerous unsolicited calls to a prospective CIG client ("Client 1"). Avila identified himself as President of LIFT, which he described as an investment company in Dallas, Texas, and told Client 1 that he would open an individual account at CIG in the name of Client 1. Avila further directed Client 1 to wire his

14

funds to one of the LIFT Bank Accounts in Dallas and that in return Client 1's funds would be used to trade commodity calls and puts in "North East U.S. oil" ("oil options") and gold options on U.S. exchanges.  Avila assured Client 1 that gold was a riskless investment that would appreciate over the next few months and the oil options were cheap now and would increase in value during the winter months.  Avila further assured Client 1 that he would be able to access and view his trading account on CIG's Website and would receive a CIG generated user ID and password to keep track of how his investment was performing.

46.     As a result of relying upon Avila's representations and review of the CIG and LIFT Websites, which confirmed that LIFT was located in Dallas, Texas and that CIG shared the same Dallas address with LIFT, Client 1 wired a total of $29,505 in August and September 2019 to LIFT's bank account.  Shortly after wiring the funds, Avila falsely informed Client 1 over the phone that gold and oil options were purchased on his behalf.  Contrary to Avila's representations, however, Client 1 never received a user ID and password, never had access to his trades online, never received trading statements by email or mail and, instead, only received verbal representations from Avila regarding his trades.  In late fall/early winter 2019, Avila told Client 1 over the phone that his options had doubled in price to about $65,000.  Shortly after that, Avila told Client 1 that all his money was lost because the options expired worthless.  All of Avila's representations to Client 1 were false.  Client 1's funds were never traded.

e.  *Avila's Concealment of his Involvement in Defrauding Clients in the Prior Forex Scheme*

47.     As far back as 2016, Avila participated with TTG and others in the Prior Forex Scheme in which Avila made materially false representations to Starwood investors including that no more than 10% of an investor's funds would be at risk for any single investment trade in order to induce them to invest in this Scheme.  Avila knew that it was a false statement to

promise investors that in any single trade they could not lose more than 10%.  Avila also

concealed from investors that their funds were used to pay other investors and for unauthorized

and undisclosed expenses.

48.    By the fall of 2017, while the Prior Forex Scheme was still ongoing, Avila and the

other CIG Defendants started the CIG Scheme and Avila concealed from CIG clients that he had

defrauded Starwood investors.

**B.    Trading Ventures Scheme**

49.    During the Second Relevant Period, the Trading Ventures Defendants, including

Avila directly, and through their officers, employees or agents engaged in a scheme and artifice

to defraud TVG clients by fraudulently soliciting clients to invest in Derivatives and Forex

through TVG; making false material representations, pretenses, and promises to clients; failing to

disclose and/or concealing material information from clients; misappropriating client funds; and

making and/or assisting in making available fake trading statements to TVG clients.

50.    The Trading Ventures Defendants, like the CIG Defendants, made use again of

salesmen who claimed to be TVG traders ("TVG Traders"), TVG's Website and related email:

info@tradingventuresgroup.com ("TVG Email"), and the TVG, CVG, and VGL Bank Accounts

to trick TVG clients to invest and further perpetuate this fraudulent scheme.

a. *TVG Website*

51.    The TVG Website represented to clients that TVG was "a leading commodities

brokerage firm" offering investments in Derivatives and Forex and a variety of other financial

products. The TVG Website also claimed that TVG would turn clients into "winning commodity

trader[s]."  TVG invited potential clients to "register with TVG to get access to individualized

services specifically targeted for your investment goals."

52.     The statements, representations, and promises on the TVG Website were false. TVG was not a brokerage firm trading in Derivatives and Forex or other financial products. TVG is a sole member Texas company that had salesmen make unsolicited calls under false pretenses to potential and actual TVG clients.  These salesmen falsely claimed to be TVG Traders who would open, manage, and trade individual accounts in Derivatives and Forex for TVG customers.  TVG had no traders, managed no client trading accounts, and did no trading, as promised.

53.     According its website, TVG had offices in Irving, Texas, which provided "US Client Services" and had its headquarters at Canary Wharf in London, UK.  These statements were false.  TVG's office in Texas did not provide US client services; it was merely a virtual office paid through the TVG and VGL Bank Accounts controlled by Avila.  Avila and others used this office to send promotional materials to potential clients and used the TVG, CVG, and VGL Bank Accounts to receive client funds for investment through TVG.  TVG clients were falsely led to believe that their funds were going to be maintained in U.S. based bank accounts controlled by the Ventures Companies for the purpose of trading Derivatives and Forex. However, these funds were instead stolen and most were wired to bank accounts in Costa Rica.

b.  *TVG Defendants' Fraudulent Conduct*

54.     The Trading Ventures Scheme was very similar, if not often identical, to the CIG Scheme.  TVG salesmen, on behalf of the TVG Defendants, contacted TVG clients from a list of potential investors purchased by Avila and paid through the LIFT, CVG, and VGL bank accounts.  The TVG salesmen fraudulently solicited clients mostly by phone, email, and the TVG Website, and Email to open individual accounts to trade Derivatives and Forex through TVG.  These salesmen represented to TVG clients that their money was safe because their trades

were made through TVG, a broker based out of Texas, using bank accounts in the U.S. held by TVG, CVG, and VGL.  The salesmen also represented to TVG clients that their trading would be cleared by a company in the UK, that they would double their deposits in a few months, and/or that they would realize a 30% return on investment per year.  The salesmen told TVG clients that they would not pay up-front commissions because TVG Traders would only take a 15% profit on those trades that made at least a 30% profit.  TVG clients were also given access to fake account statements by the TVG Defendants.  One client, for example, saw his $36,000 deposit grow to $71,000 in a couple of months on fake account statements.  Another client saw a $5,000 deposit increase to $10,000 in a month on a fake account statement.  Yet another client saw his deposit grow 600% in three months on fake statements.  These returns were false because there was no trading, as promised, and no profits earned from trading or otherwise.  Instead, TVG clients lost most or all of their money just like clients did in the CIG Scheme.

55.     The Trading Ventures Scheme followed the same account onboarding, marketing, and account activation as in the CIG Scheme.  As in the CIG Scheme, Avila, at times, facilitated onboarding of new TVG client by sending or under his direction ensuring that client account opening and trading forms were sent to TVG clients.  In return, Avila received some of these forms from the TVG clients and/or sent them to at least one of the Ventures Companies.

56.     Also, as in the CIG Scheme, Avila at times facilitated and marketed TVG to potential or actual TVG clients by sending or directing to be sent TVG Promotional Materials, including a welcome letter, a power point presentation, and purported market analyses to TVG clients ("TVG Promotional Materials").  As with the CIG Trading Scheme, the TVG power point presentation misrepresented to TVG clients that TVG was a brokerage investment firm.  The power point presentation -- sometimes using similar language and photos used in the CIG power

point presentation -- misrepresented to TVG clients that TVG was one of the leading brokers in the commodities markets in the world and used "clearing providers and liquidity venues … authorized and regulated by the Financial Conduct Authority … in the UK."  The presentation also provided TVG's purported registration number with the Financial Conduct Authority, the UK's financial regulator ("FCA").  Avila also, at times, made available or directed another person to make available to TVG clients, a welcome letter that said TVG's "clearing companies are regulated by the financial authorities and most respected banks in the world.  These entities regulate all the movements and transactions of TVG."

57.     As with CIG, the TVG Traders' solicitations, and TVG's Promotional Materials that Avila directly sent or under his direction were sent to TVG clients were false.  TVG was not a broker in the commodity markets and did not trade TVG clients' investments, as promised.  None of the entities identified in the presentation as clearing providers or liquidity venues for TVG had a relationship with TVG.  Further, TVG was not registered with the FCA.  TVG clients' investments were not safe with TVG and the TVG, CVG, and VGL Bank Accounts were used by the TVG Defendants to misappropriate TVG clients' funds.  Moreover, the purported TVG traders led at least some TVG clients to falsely believe their funds deposited into the CVG and VGL bank accounts were going to be maintained in these U.S. bank accounts by CVG and VGL, both U.S. companies, when in fact their funds were transferred to Costa Rica.

58.     As in the CIG Trading Scheme, once the Ventures Companies received executed copies of the TVG client forms sent to TVG clients by Avila or, as instructed by Avila, TVG clients received a TVG Email notifying them that their accounts were ready to receive funds, received an ID/password to access their trading accounts in the TVG Website, and were provided

instructions to wire or make checks payable to TVG at the TVG, CVG, and VGL Bank

Accounts, which the TVG Defendants then used to misappropriate TVG client funds.

59.     Once the TVG, CVG, and VGL Bank Accounts received TVG clients'

investments, TVG clients then received a TVG Email informing them that their "trading

accounts' were funded and provided them with an ID or password and an account number to

access their trading statements through the TVG Website platform.  Like in the CIG scheme,

TVG trading statements were false in that they contained fake trades and fake profit and loss

information.

60.     Avila prepared and/or used an updated version of the same Spreadsheet he used

in the CIG Scheme to record the transfer of client funds.  TVG Defendants transferred TVG

Client funds mostly to bank accounts in Costa Rica.  Avila also used $63,000 of TVG clients'

investments for his own purposes, including paying high interest personal loans, spending funds

at restaurants, using funds for travel and purchasing consumer goods, and writing checks to

himself.  For example, from May 2020 to September 2020, Avila wrote nine checks to himself,

drawn from customer funds, in the amount of at least $23,000.  Furthermore, in the manner of a

Ponzi scheme, $27,000 of certain TVG clients were returned to other TVG client funds.  For

example, one particular TVG client invested $40,000 and received in return $8,015 from other

TVG client funds.

61.     As in the CIG scheme, in late winter or early spring 2020, TVG clients started to

see purported losses in their accounts and tried to contact their purported TVG brokers to attempt

to withdraw their funds, but were ignored.  Ultimately the result was the same, most TVG clients

lost most if not all their investments and only a handful were able to use a withdrawal form to

receive a small fraction of their investment.

c.   *Avila's Concealment of his Involvement in Defrauding Clients in the Prior Forex Scheme*

62.   As with the CIG Scheme, Avila again, during the Second Relevant Period, failed to disclose to TVG clients that he was involved in the Prior Forex Scheme and that he had defrauded Starwood clients by making materially false representations to induce them to invest in the Prior Forex Scheme.

d.   *Avila's Role in Ordering that Evidence be Destroyed*

63.   In January 2020, Avila received a subpoena ad testificandum and duces tecum from the Commission for his testimony and for the production of documents, including, but not limited to, emails and communications in his possession or control that related, referred to, or concerned the Prior Forex Scheme, CIG, LIFT, TTG, and individuals and entities associated with these entities.

64.   In February 2020, Avila directed an agent of TVG to delete texts of conversations relating to TVG and an individual associated with TTG.

65.   Avila told the agent not to call him on the phone because the FBI was listening in on his phone conversations.  He told the agent to only talk to him in person.

**C.   Avila's Guilty Plea**

66.   On September 30, 2020, Avila was arrested by the FBI in connection with his role in the Prior Forex Scheme, as well as the CIG and Trading Ventures Schemes.

67.   On February 24, 2021, Avila signed a plea agreement, which was filed with the Court on April 8, 2021, in the Northern District of Texas, Docket, 3:21-cr-00168.  Avila also signed a factual statement relating to the plea agreement (the "Resume"), which also was filed with the Court on April 8, 2021 in connection with the Prior Forex Scheme and the CIG and

21

Trading Venture Schemes.   On June 3, 2021, Avila pled guilty to one count of wire fraud in violation of 18 U.S.C. § 1343, which encompassed both the plea agreement and the Resume.

68.     In the Resume, which Avila and his counsel signed, Avila stipulates and agrees that he engaged in a scheme and artifice to defraud and to obtain money and property by means of materially false pretenses, representations, and promises, and through the concealment of material information from investors in a series of investment companies, including Starwood Asset Management Fund, Commodities Investment Group International, Trading Technologies Group, The L.I.F.T Group, Trading Ventures Group, Capital Ventures Group, and Ventures Group, LLC. (collectively, the "Investment Entities").  Avila further admits that in furtherance of the scheme and artifice to defraud, he had various roles in each entity, including marketing, facilitating, owning, controlling, and/or operating the Investment Entities.  Avila admits that none of the Investment Entities were registered with the United States Securities and Exchange Commission or the Commodity Futures Trading Commission as required.

69.     Avila also admits in the Resume that he and others falsely represented to investors that no more than 10% of an investor's funds would be at risk for any single investment trade. The Resume further states that Avila and others concealed from investors that investment funds were used to make payments to other investors and for other unauthorized and undisclosed expenses.

70.     Avila further admits in the Resume that he and others falsely represented to investors that all investment funds were controlled by U.S.-based businesses.  Avila also admits that he set up U.S.-based accounts in order to falsely represent to investors that investment funds were maintained in the United States when, in fact, Avila wired most of the money to an individual located in Costa Rica.  Avila further admits he registered office space in the Dallas

Fort Worth area to represent to investors that investments were controlled by U.S. based businesses.  Avila further admits that he mailed fraudulent marketing material from the United States on behalf of coconspirators located in Costa Rica to represent that the Investment Entities were U.S. based businesses.

71.     In addition, Avila admits that some of the investment funds were used for his personal and business expenditures.

72.     Avila further admits that he agrees he committed all the essential elements of the offense and that the Resume is not intended to be a complete accounting of all the facts and events related to the offense charged in this case.  Avila admits that the limited purpose of the statement of facts is to demonstrate that a factual basis exists to support his guilty plea to Count One of the information.

**D.     <u>CIG and TVG Acted as Commodity Trading Advisors</u>**

73.     CIG, during the First Relevant Period, and TVG, during the Second Relevant Period, while acting as commodity trading advisors ("CTAs"), for compensation or profit, engaged in the business of advising, managing, and trading Derivatives and Forex on behalf of their clients, representing through their purported Traders, among other things, that these traders would manage their client accounts and use their discretion to trade their funds.  Further, clients were told that their purported traders would receive a commission of 15% for every trade that made a profit of at least 30% for its clients.

74.     CIG and TVG made use of the mails or any means of interstate commerce in connection with their business as a CTA, in that they used their purported Traders, their Websites, their Emails, and their bank accounts (to send funds to other bank accounts in the U.S. and internationally), to advise clients, manage their trading accounts and purport to trade

Derivative and Forex on their behalf, while also failing to register with the Commission as a CTA.

75.     CIG and TVG, through their purported Traders, also obtained discretionary trading authority over accounts of their clients in connection with Commodity transactions. Clients, for example, were told that their purported Traders set up accounts for them with CIG and TVG respectively and that these purported Traders would then use their discretion to trade on their behalf.

76.     CIG and TVG clients were not eligible contract participants ("ECPs") as defined under Section 1a(18) of the Act, 7 U.S.C. § 1a(18) (2018) and therefore their transactions were not exempted from coverage under Section 2(c)(2)(C)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)((I). CIG and TVG clients did not meet the threshold of $10 million in assets or did not have $5 million in assets and were not entering into these transactions to manage their risks associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred.  As such, CIG and TVG were required to register as a CTA and failed to do so.

**E.  Avila Controlled LIFT and VGL**

        a. *LIFT*

77.     LIFT is single member limited liability company formed in Texas.  Avila formed LIFT with the Texas Secretary of State, designated himself as LIFT's registered agent, and provided his residential address as the registered office address for LIFT.

78.     Avila signed the lease for LIFT's business offices at LIFT's virtual office location in Dallas, Texas.  Avila then filed a Statement of Change of Registered Office/Agent with the Texas Secretary of State changing LIFT's registered business address from his residential address to LIFT's business address its the virtual office in Dallas, Texas.

79.     Avila opened and was a signatory in the LIFT Bank Accounts.

80.     At various times, Avila represented to the banks holding the LIFT Bank Accounts that he was the sole member, managing member, owner director, and/or chief executive of LIFT.

81.     Avila authorized all transactions in the LIFT Bank Accounts.

82.     Avila also represented to the public that he was the president of LIFT.

83.     As such, Avila is liable for LIFT's violations of the Act and Regulations pursuant to Section 13(b) of the Act, because he controlled LIFT and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting LIFT's violations.

    b.  *VGL*

84.     VGL is a sole member limited liability company in Texas and Avila was VGL's sole member.  Avila formed VGL with the Texas Secretary of State, designated himself as VGL's registered agent, and provided a registered office address for VGL, which was the same business address and office number of LIFT's virtual office in Dallas, Texas.

85.     Avila signed the lease for VGL's business offices at a second virtual office location in Irving, Texas, where TVG also has a virtual office.

86.     Avila opened and was the sole signatory for the VGL Bank Account.

87.     Avila represented to the bank holding the VGL Bank Account that he was the sole owner with "control" over VGL.

88.     Avila authorized all transactions in the VGL Bank Account.

89.     As such, Avila is liable for VGL's violations of the Act and Regulations pursuant to Section 13(b) of the Act, because he controlled VGL and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting VGL's violations.

## V.    STATUTORY AND REGULATORY VIOLATIONS

### COUNT I

**Violations of Sections 4b(a)(1)(A), (B), (C) and 4b(a)(2)(A), (B), (C) of the Act, 7 U.S.C. §§ 6b(a)(1)(A), (B), (C) and 6b(a)(2)(A), (B), (C) (2018) and Regulation 5.2(b), 17 C.F.R. § 5.2(b) (2020)**

**(FUTURES and FOREX FRAUD VIOLATIONS)**

90.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

91.    7 U.S.C. § 6b(a)(1)(A), (B), (C) makes it unlawful:

[F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person…–(A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract, or in regard to any act of agency performed, with respect to any order or contract for … the other person.

92.    7 U.S.C. § 6b(a)(2)(A), (B), (C) makes it unlawful:

[F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery,  . . . that is made, or to be made, for or on behalf of, or with, any other person other than on or subject to the rules of a designated contract market–(A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person.

93.     Section 2(c)(2)(C)(iv) of the Act, 7 U.S.C. § 2(c)(2)(C)(iv) (2018), states that Section 4b of the Act, 7 U.S.C. § 6b (2018), applies to retail off-exchange forex transactions, agreements, or contracts, such as those offered by the CIG and TVG Defendants, as if they were contracts of sale of a commodity for future delivery.

94.     17 C.F.R. § 5.2(b) makes it unlawful:

> [F]or any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail foreign exchange transaction: (1) To cheat or defraud or attempt to cheat or defraud any person; (2) Willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record; or (3) Willfully to deceive or attempt to deceive any person by any means whatsoever.

95.     As described herein, Avila, CIG, TTG, LIFT, TVG, CVG, and VGL violated 7 U.S.C. §§ 6b(a)(1)(A), (B), (C), 6b(a)(2)(A), (B), (C) and 17 C.F.R. § 5.2(b) by cheating or defrauding, or attempting to cheat or defraud, other persons; making or causing to be made false statements and records; and willfully deceiving or attempting to deceive other persons, directly and/or through their officers, employees or agents, by, among other things: (i) falsely representing to CIG and TVG clients, respectively, that traders would use their discretion to trade clients' funds in Derivatives and Forex; (ii) falsely promising clients profits; (iii) providing clients with access to fake trading statements that reflected fictitious trading gains and losses; (iv) concealing and failing to disclose to clients that their funds were not used, as promised, to trade Derivatives and Forex; (v) concealing and failing to disclose that there were no profits from trading and/or that they could not promise profits; and (vi) and misappropriating client funds and concealing and failing to disclose to clients that their funds were misappropriated.

96.     Avila, CIG, TTG and LIFT, directly and/or through their officers, employees or agents, also falsely represented to CIG clients that CIG was a U.S. based company and that CIG

client investments were controlled by U.S. based businesses and maintained in the U.S. in U.S. bank accounts and failed to disclose to CIG clients that CIG was a Costa Rican company operating in Costa Rica.

97.     Avila, TVG, CVG, and VGL, directly and/or through their officers, employees or agents, also falsely represented to TVG clients that TVG client investments were going to be maintained in U.S. bank accounts when in fact their funds were transferred to Costa Rica.

98.     In addition, Avila failed to disclose to CIG and TVG clients that he was involved in a Prior Forex Scheme involving Starwood and, during the course of this Prior Forex Scheme, Avila defrauded Starwood clients.

99.     Avila, CIG, TTG, LIFT, TVG, CVG, and VGL engaged in the acts and practices described above using instrumentalities of interstate commerce, including but not limited to: phone, mail, interstate wires for transfer of funds, websites, emails, bank accounts (funds were sent to bank accounts in the U.S. and internationally).

100.    Avila, CIG, TTG, LIFT, TVG, CVG, and VGL engaged in the acts and practices described above willfully or with reckless disregard for the truth.

101.    Each act of fraudulent solicitation, misappropriation, omission, and false statement or report by Avila, CIG, TTG, LIFT, TVG, CVG, and VGL including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. §§ 6b(a)(1)(A), (B), (C) and 6b(a)(2)(A), (B), (C) and 17 C.F.R. § 5.2(b).

102.    LIFT, CIG, TTG, TVG, CVG, and VGL are liable for the actions of their officers, employees, or agents, including Avila, and thus are also liable for the Futures and Forex Fraud Violations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2 (2020).

103.    Avila, as the controlling person of LIFT and VGL is liable for the Futures and

Forex Fraud Violations of LIFT and VGL pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b)

(2018).

## COUNT II

**Violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018) and Regulation 33.10, 17
C.F.R. § 33.10 (2020)
(OPTIONS FRAUD VIOLATION)**

104.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference.

105.    7 U.S.C. § 6c(b) (2018) provides "No person shall offer to enter into, enter into or

confirm the execution of any transaction involving any commodity regulated under this Act

which is of the character of, or is commonly known in the trade as, an "option", … "bid", …

"offer", … "put" [or] "call" … contrary to any rule [or] regulation, of the Commission . . .

prohibiting any such transaction or allowing any such transaction under such terms and

conditions as the Commission shall prescribe."

106.    17 C.F.R. § 33.10 provides that:

> It shall be unlawful for any person directly or indirectly -- (a) To
> cheat or defraud or attempt to cheat or defraud any other person;
> (b) To make or cause to be made to any other person any false
> report or statement thereof or cause to be entered for any person
> any false record thereof; or (iii) To deceive or attempt to deceive
> any other person by any means whatsoever in or in connection
> with an offer to enter into, the entry into, the confirmation of the
> execution of, or the maintenance of, any commodity option
> transaction.

107.    Avila, CIG, TTG, LIFT, TVG, CVG, and VGL violated 7 U.S.C. 6c(b) (2018)

and 17 C.F.R. § 33.10 (2018) in that they cheated or defrauded or attempted to cheat or defraud

other persons, made or caused to be made to any other person any false report or statement

thereof or caused to be entered for any person any false record thereof, and willfully deceived or attempted to deceive other persons in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction, directly and/or through their officers, employees or agents, by, among other things: (i) falsely representing to CIG and TVG clients, respectively, that traders would use their discretion to trade clients' funds in Derivatives and Forex; (ii) falsely promising clients  profits; (iii) providing clients with access to fake trading statements that reflected fictitious trading gains and losses; (iv) concealing and failing to disclose to clients that their funds were not used, as promised, to trade Derivatives and Forex; (v) concealing and failing to disclose that there were no profits from trading and/or that they could not promise absolute returns and/or profits; and (vi) misappropriating client funds and concealing and failing to disclose to clients that their funds were misappropriated.

108.    Avila, CIG, TTG, and LIFT, directly and/or through their officers, employees or agents, also falsely represented to CIG clients that CIG was a U.S. based company and that CIG client investments were controlled by U.S. based businesses and maintained in the U.S. in U.S. bank accounts and failed to disclose to CIG clients that CIG was a Costa Rican company operating in Costa Rica.

109.    Avila, TVG, CVG, and VGL, directly and/or through their officers, employees or agents, also falsely represented to TVG clients TVG client investments were going to be maintained in U.S. bank accounts when in fact their funds were transferred to Costa Rica.

110.    In addition, Avila failed to disclose to CIG and TVG clients that he was involved in a Prior Forex Scheme involving Starwood and, during the course of this Prior Forex Scheme, he defrauded Starwood clients.

111.     Avila, CIG, TTG, LIFT, TVG, CVG, and VGL engaged in the acts and practices described above using instrumentalities of interstate commerce, including but not limited to: phone, mail, interstate wires for transfer of funds, websites, emails, and bank accounts (funds were sent to bank accounts in the U.S. and internationally).

112.     Avila, CIG, TTG, LIFT, TVG, CVG, and VGL engaged in the acts and practices described above willfully or with reckless disregard for the truth.

113.     Each act of fraudulent solicitation, misappropriation, omission, and false statement or report by Avila, CIG, TTG, LIFT, TVG, CVG, and VGL including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. 6c(b) (2018) and 17 C.F.R. § 33.10 (2018).

114.     LIFT, CIG, TTG, TVG, CVG, and VGL are liable for the actions of their officers, employees, or agents, including Avila, and thus are also liable for the Options Fraud Violations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2 (2020).

115.     Avila, as the controlling person of LIFT and VGL is liable for the Options Fraud Violations of LIFT and VGL pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2018).


## COUNT III

**Violations of Section 4*o*(1)(A) and (B) of the Act, 7 U.S.C. § 6*o*(1)(A) and (B) (2018)**
**(CTA FRAUD VIOLATION)**

116.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

117.     7 U.S.C. § 6*o*(1) (2018), in part, makes it unlawful for a CTA to:

[B]y use of the mails or any other means or instrumentality of interstate commerce, directly or indirectly–(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

118.    CIG and TVG violated 7 U.S.C. § 6*o*(1)(A) and (B), in that by use of the mails or any means or instrumentality of interstate commerce, while acting as a CTA, CIG directly or indirectly employed a device, scheme, or artifice to defraud clients or engaged in transactions, practices, or a course of business which operated as a fraud or deceit upon clients, directly and/or through their officers, employees or agents, by, among other things: (i) falsely representing to CIG and TVG clients, respectively, that traders would use their discretion to trade clients' funds in Derivatives and Forex; (ii) falsely promising clients profits; (iii) providing clients with access to fake trading statements that reflected fictitious trading gains and losses; (iv) concealing and failing to disclose to clients that their funds were not used, as promised, to trade Derivatives and Forex; (v) concealing and failing to disclose that there were no profits from trading and/or that they could not promise absolute returns and/or profits; and (vi) misappropriating client funds and concealing and failing to disclose to clients that their funds were misappropriated.

119.    CIG, directly and/or through its officers, employees or agents, also falsely represented to CIG clients that CIG was a U.S. based company and that CIG client investments were controlled by U.S. based businesses and maintained in the U.S. in U.S. bank accounts and failed to disclose to CIG clients that CIG was a Costa Rican company operating in Costa Rica.

120.    TVG, directly and/or through its officers, employees or agents, also falsely represented to TVG clients that TVG client investments were going to be maintained in U.S. bank accounts when in fact their funds were transferred to Costa Rica.

121.     Each act of fraudulent solicitation, misappropriation, and false statement or report, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1)(A) and (B).

122.     CIG and TVG engaged in the acts and practices described above using instrumentalities of interstate commerce, including but not limited to: phone, mail, interstate wires for transfer of funds, websites, emails, and bank accounts (funds were sent to bank accounts in the U.S. and internationally).

123.     CIG and TVG engaged in the acts and practices described above willfully or with reckless disregard for the truth.

124.     Each act of fraudulent solicitation, misappropriation, omission, and false statement or report by CIG and TVG including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1)(A) and (B).

125.     CIG and TVG are liable for the actions of their officers, employees, or agents, including Avila, and thus are also liable for the CTA Fraud Violations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2 (2020).

## COUNT IV

**Violations of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2018) and Regulation 5.3(a)(3), 17 C.F.R. § 5.3(a)(3)**
**(CTA REGISTRATION VIOLATION)**

126.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

127.     7 U.S.C. § 6m(1) provides that "[i]t shall be unlawful for any commodity trading advisor … unless registered under this Act, to make use of the mails or any means or

33

instrumentality of interstate commerce in connection with his business as such commodity trading advisor …."

128.    17. C.F.R. § 5.3(a)(3) provides that "[a]ny commodity trading advisor, as described in § 5.1(e)(1) of this part, is required to register as a commodity trading advisor."

129.    Section 5.1(e)(1) provides that a "Commodity Trading Advisor … means any person who exercises discretionary trading authority or obtains written authorization to exercise discretionary trading authority over any account for or on behalf of any person that is not an eligible contract participant as defined in Section 1a(18) of the Act, in connection with retail forex transactions."

130.    CIG and TVG, through their purported traders, and/or through their officers, employees or agents, obtained discretionary trading authority over accounts of TVG clients who were not eligible contract participants ("ECPs") as defined in Section 1a(18) of the Act, 7 U.S.C. § 1a(18) (2018), in connection with Commodity transactions.

131.    CIG, and TVG for compensation or profit, engaged in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in any contract of sale of a commodity for future delivery and/or trading in any commodity options as defined by Section 1a(12) of the Act, 7 U.S.C. § 1a(12) (2018), and thus acted as a CTA.

132.    CIG and TVG made use of the mails or any means of interstate commerce in connection with their business as a CTA, while failing to register with the Commission as a CTA, in violation of 7 U.S.C. § 6m(1).

133.    Through the actions described above in paragraphs 126-132, CIG and TVG, respectively, were required to register as a CTA and failed to do so.  Accordingly, CIG and TVG violated 7 U.S.C. 6m(1) and 17 C.F.R. § 5.3(a)(3).

## VI.    RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-l (2018), and under the Court's own equitable powers, enter:

a)    An order finding that Avila, CIG, TTG, LIFT, TVG, CVG, and VGL violated Sections 4b(a)(1)(A), (B), (C), 4b(a)(2)(A), (B), (C), and 4c(b) of the Act, 7 U.S.C. §§ 6b(a)(1)(A), (B), (C), 6b(a)(2)(A), (B), (C), and 6c(b) (2018), and Commission Regulations 5.2(b) and 33.10, 17 C.F.R. §§ 5.2(b) and 33.10 (2020);

b)    An order finding that CIG and TVG violated Sections 4m(1) and 4*o*(1)(A) and (B) (2018) of the Act, 7 U.S.C. §§ 6m(1) and 6*o*(A), (B) and Commission Regulation 5.3(a)(3), 17 C.F.R. § 5.3(a)(3) (2020);

c)    An order of permanent injunction prohibiting Avila, CIG, TTG, LIFT, TVG, CVG, and VGL and any of their affiliates, agents, servants, employees, successors, assigns, attorneys, and persons in active concert or participation with Defendants, from directly or indirectly:

(i)    trading on or subject to the rules of any registered entity (as that term is defined in Section la of the Act, 7 U.S.C. § la (2018));

(ii)    entering into any transactions involving "commodity interests" (as that term is defined in Commission Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2020), for Defendants' own accounts or for any account in which they have a direct or indirect interest;

(iii)    having any commodity interests traded on Defendants' behalf;

(iv)     controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

(v)     soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

(vi)     applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2020);

(vii)     acting as a principal (as that term is defined in Commission Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2020)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9);

d)     An order requiring Avila, CIG, TTG, LIFT, TVG, CVG, and VGL and any third-party transferee and/or successors thereof, to disgorge to any officer appointed or directed by the Court all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act as described herein, including pre-judgment and post-judgment interest;

e)     An order directing Avila, CIG, TTG, LIFT, TVG, CVG and VGL and any successors thereof, to rescind, under such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the clients whose funds were received by them as a result of the acts and practices that constituted violations of the Act, as described herein;

f)      An order requiring Avila, CIG, TTG, LIFT, TVG, CVG, and VGL, as well as their successors, to make full restitution, pursuant to such procedure as the Court may order, to every person or entity who sustained losses proximately caused by Defendants' violations (in the amount of such losses), as described herein, plus pre-judgment interest thereon from the date of such violations, plus post-judgment interest;

g)      An order directing Avila, CIG, TTG, LIFT, TVG, CVG, and VGL to pay civil monetary penalties, to be assessed by the Court, in an amount not more than the penalty prescribed by 7 U.S.C. § 13a-1(d)(1) (2018) as adjusted for inflation under the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. No. 114–74, 129 Stat. 584 (2015), title VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2020) for each violation of the Act, as described herein;

h)      An order requiring Avila, CIG, TTG, LIFT, TVG, CVG, and VGL to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2018); and

i)      Such other and further relief as the Court deems proper.


Dated: September 14, 2021

Respectfully submitted,


*/s/ Xavier E. Romeu-Matta*

Xavier Romeu-Matta, *pro hac vice* pending
Registration number: 2416253 (New York)
Trial Attorney
xromeumatta@cftc.gov

Steven Ringer, *pro hac vice* pending
Chief Trial Attorney
Registration number:  2157790 (New York)
sringer@cftc.gov

Manal Sultan, *pro hac vice* pending
Deputy Director
Registration number: 2738805 (New York)
msultan@cftc.gov

Commodity Futures Trading Commission
140 Broadway 19th Floor
New York, NY 10005
(646) 746-9700

*Attorneys for Plaintiff*
*Commodity Futures Trading Commission*